17-60644, Ava Coleman v. Mississippi Department of Marine Resources. Are you ready to proceed? May it please the Court, my name is Kay Persons. I'm here today on behalf of Ava Coleman, the appellant in this case. It's my privilege to represent Ms. Coleman who is a daughter of a Yugoslavian immigrant boat builder who brought herself up from meager beginnings into a position of the first female fish hatchery manager in the Mississippi State Agency and its history. She worked for 25 years total before her termination that we're talking about here today in October of 2014. She worked initially for the Department of Fisheries and Wildlife and that's where she served for 15 years as the Lyman Fish Hatchery Manager. Before, in April 2007, William Walker, who was at that point the Executive Director of the Department of Marine Resources, came to the fish hatchery and announced that the hatchery and Ms. Coleman's position were being reassigned to the Department of Marine Resources. Ms. Coleman was assured by Mr. Walker that she would remain doing the same job essentially, but that she would have to move from the fish hatchery. She actually lived or was required to live on site and had done so for 15 years. He assured her that she would be able to continue her work and her career and therefore agreed to his request that she voluntarily accept that reassignment. So that's what she did. Unfortunately, what happened next was not at all what was promised. I digress a moment to inform the court that William Walker is one and the same William Walker who later, after Ms. Coleman's termination, pled guilty and received a federal prison sentence of five years and fines of over half a million dollars in connection with his criminal mismanagement of the Department of Marine Resources. Ms. Coleman, under Dr. Walker's supervision, found herself under attack by his chief of staff, Joe Ziegler, who was also a named co-conspirator in the criminal prosecution that occurred. At the time of Ms. Coleman's termination, I don't believe either of those gentlemen were working at the department. Is that correct? Yes, Your Honor, and I will get to the issue of, at least with respect to the discrimination claims, temporal proximity is, of course, the most common ground on which there's an inference of pretext. And I'm talking, of course, about the DMR's professed reason for terminating Ms. Coleman was based on the legislature's passage of what I will refer to, just because it's a simpler title, as Senate Bill 2579, which basically gave the DMR permission to terminate individuals within that organization for a six-month period in an effort to address problems that the agency had as a result of the criminal wrongdoings by Dr. Walker and his co-conspirators. But at the time of those terminations, there were 11 men, 5 women who were terminated. So how does Ms. Coleman fall into some special class as being treated differently? Well, with respect to the inference of pretext, I would suggest, Your Honor, that not only is there a connection, although admittedly that the dates go far back, 2007, to the termination in 2014, but they involve a pattern of antagonistic, and we would suggest disparate treatment based on improper grounds in violation of Title VII. These would include Mr. Ziegler would not give Ms. Coleman the supplies, equipment, or assistance she needed. He locked her out of her office. But again, he was not there at the time of her termination. Yes, you're correct, Your Honor. However, Ms. Coleman had a mental breakdown as a result of this whole scenario beginning in 2007 and, in fact, was on extended medical leave for a year, came back to work in 2008, and was placed by the agency into an amorphous position at the headquarters of DMR. She also had her own workplace problems. I think the record reflects that she had problems with her coworkers, including cursing at coworkers, yelling at a number of her colleagues. So it seems like the entire workplace was kind of dysfunctional. Your Honor, and it's in the brief, but Ms. Coleman did experience some conflict, especially with some coworkers who resented the fact, understandably so, that she had been placed at the order of an employee appeals board judge. She grieved these actions that I've talked about. The judge, I represented her at that hearing. The judge stopped the hearing after he heard enough evidence, and while he said, Ms. Coleman, you know, you may have been a little too feisty with Mr. Ziegler. She's a bigger, larger-than-life person. I wish she was able to come with me here today. But he says, I can see that you're experienced and valuable and, you know, good marine fishery scientist. She's also a certified public manager under the state's qualification system. And he told DMR, you find this lady a job. And so what they did was put her in this amorphous trip ticket operation, which set her next to people making far less than she was because they couldn't lower her salary at the judge, after the judge's ruling. Basically, they used this six-month window of opportunity to say, Ava Coleman's out of here, and we don't have to give her civil service protections like she had when she questioned our prior actions. Now, I realize there is a difference, I mean, an extensive timeframe different than what normally is seen in these cases. But wasn't the denial of civil service protection, wasn't that the result of the Senate bill you talked about? Well, that was how they did it. That's how they were able to do it. But, I mean, this was an act of the state legislature. It was an act of the state legislature, Your Honor, but, and we're getting You're not suggesting it was directed at Ms. Coleman. Yes, Your Honor, I am suggesting The passage of the act was directed at Ms. Coleman. No, sir, I'm sorry. Not the passage of the act, but DMR used that window of opportunity improperly, I would suggest. The U.S. Supreme Court in its Logan case, I'll get to the site, said that there's an exception for the general rule that these legislative suspensions of civil service protections, we're talking about a person who's had civil service protections for 25 years, being told you're out the door, take, you know, we're going to No, I understand all that. But all I'm getting at is the denial of the civil service protection was a result of that Senate bill. I mean, it allowed it with this agency for this period of time, there just was no civil service protection, so you could, they were essentially at-will employees. Well, Your Honor, that Was that the result of the bill? I think that's what DMR would argue, but the Supreme Court in Logan, which is 455 U.S. 422, at 433 says exceptions to that general rule, and you're talking, I know, about as long as there's a group of people involved, that this is a permissible constitutional action. It cannot be used if the individual citizen is damaged by that action in a wholly arbitrary or irrational manner. How was it arbitrary if 11 men and 4 other women were also terminated? Your Honor, it was an opportunity that DMR seized upon. She was the very last one removed. Would it have made a difference if she was the first one removed? Well, it certainly, in my mind, would indicate that a little more rational basis, if that's what they were really thinking of doing. Well, if they were really after her, they would have gotten her first, wouldn't they? Well, except that two weeks before this termination, she went to a hearing on these claims for this mental breakdown that was job-related, bringing all of those issues from 2007 forward into more current cognition, or whatever the correct word is, so that two weeks after that hearing where they had to settle that case, she's out the door. I think there is, if you take all the evidence of record in this case, I think you see that, number one, there's an inference of pretext in that the person they say replaced Ms. Coleman is a contract worker who has no academic qualifications, not a fishery scientist. She's someone that Ms. Coleman had helping her collect the trip tickets, which is basically notations from fishermen about what they've caught that the DMR scientists use to project how many red snapper you can catch. How long did she work at the job collecting trip tickets? From the point when she was brought back to work, according to the judge's instructions, and her medical leave was up in 2008. I'm sorry, 2009, June 2009. So five years she's working. There's these issues with coworkers who basically Ms. Coleman is baked in a squat, as they say in the South. She's got this situation where the judge has put her... I'm from the deep South. That's one I haven't heard. Well, my grandmother said the biscuits got baked in a squat. If there's nothing you can do about it, it's a situation where you're just thrown in here where these people are upset with you because they're sitting there... Maybe I don't want to know what the squat is. Well, Ms. Coleman was... All right. Well, to take your... I want to make sure I understand. Ms. Coleman had mutual conflict at her job with some supervisors. Those supervisors then left, and then the Senate passes a bill which allows the agency to be reorganized, and she doesn't have civil service protection. So under new management, under the protection of a Senate bill, she is removed, not by herself, but along with 11 other men and four other women. Several years later, again under new management, and her contention is that she was somehow picked on, treated differently during these intervening years, intervening managers, and again under the protection of this Senate bill, which was designed for the purpose of reorganizing this agency. Your Honor, my response to that would be if the record is looked at as a whole, which according to dishonorable court, all the evidence must be looked at, there is a clear, in our position, a clear pattern of antagonistic and disparate treatment of Ms. Coleman that goes beyond Dr. Walker's tenure. He went to prison essentially the same year that she was terminated, a few months later. He pled guilty. I know that's a good whipping post for you, but again, he wasn't there making the decision to terminate her, correct? You're correct, Your Honor. However, and here's another, to me, very difficult term, the cat's paw theory that the Supreme Court and a bunch of scholars have written about. It's something about the cat throwing chestnuts in the fire and then something else getting the food or something. I don't understand it, but all I know is it means that the person who makes the ultimate decision, if it's based or reflects the wrongful motivation of a prior manager or decision maker or recommender, then that is still actionable. In Title VII, of course, there is no individual liability. So it does not, the fact that the temporal proximity is different in this case than some does not, by any means, we would submit. But is there any evidence that Walker communicated after he left with these new people who came in and got him up to speed on your client and her problems that he had with them? Well, Joe Jewell, who was the supervisor of Ms. Coleman, was there the entire time. His deposition is, he does claim that he didn't know anything about all that. To me, if you look at all the evidence, that's ridiculous. He knew the agency is not huge. It's not the kind of agency where his claim that he didn't know anything, to me, is another indication inferring some kind of pretext. The bottom line is, if you look at McMurtry, the case that says, the main case, I think, that the DMR cites, it says that you can do this if it's a group of people, but McMurtry, and I think there were three others in that case, those people were all employees in a particular research and development department that was abolished. There's another case, Edamame or something like that, I may have the name, it sounds like a bean or something, but it's a close pronunciation. He was a member of a finite part of the organization, University of Texas, Pan America, or University of Texas, Brownsville. It was completely wiped out. Here, the legislature said, you take whatever actions you need to take to fix all this criminal wrong mismanagement. Ms. Coleman was one of the first adversaries of Dr. Walker. Her elimination has no rational relationship to Senate Bill 2579. In fact, it's just the opposite, we would suggest. All right, thank you, counsel. Your time has expired. Sorry. All right, FLE. Good morning, your honors, and may it please the court. There are four issues set forth in Ms. Coleman's brief, and I will go through those succinctly. If there are any questions, certainly. We may be here a little longer, but I don't anticipate using 20 minutes. The first issue is Title VII discrimination. Judge Garola correctly found that, first, Ms. Coleman failed to meet her prima facie burden in this matter. The problem for her was the fourth prong of the McDonnell-Douglas standard, which is showing that she was replaced by someone outside of her protected class. The undisputed evidence in this matter, your honors, shows that once Ms. Coleman's employment was terminated, she was replaced by a lady named Nadine Ross, referred to by Ms. Coleman in her deposition as Dini, who was a lady who was, in fact, several years older than her, and who had been working with her in the trip ticket program for an unspecified amount of time prior to Ms. Coleman's termination. Now, it depends on where you look in the record as to what Ms. Coleman says about Ms. Dini. She says that I helped train her. She calls her a crotchety old lady, says that we had lots of problems with her, and we're trying to get rid of her. She says that in her deposition at one point. But then later she goes on to say, and this is one of her many reasons for her termination that she proffers, but she says, and this is on page 274 of the record, somebody was trying to save Dini's job, Ms. Nadine Ross, so they fired me. And then she infers that Ms. Dini was connected somehow down on the coast through the shrimping industry. So that's one theory that Ms. Coleman offered us during her deposition, that this was all a ploy to give Ms. Dini a full-time position. And Ms. Dini was never hired into a full-time position, by the way. She remained as a contract worker doing the work that Ms. Coleman had been doing since 2009. Ms. Coleman says that she complains that she was transferred from the fish hatchery over to DMR's headquarters over in Biloxi to do what she classified or characterized as menial work, such as slicing otoliths. I don't know what those are, but that's something that they were doing there. And then basically collecting these trip tickets from around the coastal area and providing them to others for analysis. She says many times that this was menial work, that she was overpaid for what she was doing, and that she had to find things to do. She says that Joe Jewell, who is, depending on where you read in her deposition, is either a hero or the devil, but she says that Joe Jewell was finding things for her to do. The record indicates that she was playing her guitar at work. She'd bring that up there, bring cross-stitching up there to do. Which issue are you addressing now? I'm looking at the discrimination issue about why, I'm sorry, Your Honor, about why she was terminated. But thank you for the roadblock there. I will try to get back around to it. Well, I mean, you were talking about McDonald Douglas. Yes, yes. Four things. And she fails, it seems to me, pretty clearly on four, because she has to show that she was replaced. She was replaced by someone in her particular class. Right. So that was the first reason for the judge's ruling against her on the discrimination claim. The second was that even if she had met her standard for making her prima facie case, she couldn't demonstrate that the Department of Marine Resources' reason for terminating her was pretextual. Now, it's not listed as an issue in the brief, but Ms. Coleman sort of bootstraps this due process argument to the termination argument and says that the reason for House Bill or Senate Bill 2759 was to get rid of these criminals. And as Judge Bennett says, that's been a bit of a whipping post in this case from the district court moving forward. The Senate bill, as we point out in our brief, is the exact same language that was used when DMR was first instituted back in 1994. And it's basically a time, they brought Jamie Miller in, after all these issues that occurred with Dr. Walker and his administration, they brought Jamie Miller in and he met with Senator Bryce Wiggins. This was actually cited by Ms. Coleman and placed into the record. There was an article where Senator Bryce Wiggins met with Jamie Miller and he said, I need some flexibility to clean this place up. We've got a lot of red tape. We've got a lot of fat that I can trim here. And so the bill was not just to address criminal actions by Walker  There's no allegation, there's certainly no evidence that any of the 16 people terminated as a result of that bill were related in any way to Walker's alleged schemes and the problems that he faced and for which he was sentenced. So to say that the only purpose for that bill was to clean out criminals is just inaccurate and is not supported by the record. One of the things that I was concerned about that raised my eyebrow was the claim of retaliation. According to the record, she did file a workers' comp claim and complaints back in 2008. And that claim was eventually settled, I believe, in 2014, as Ms. Pearson says, months before she was terminated. If it's looked at in the light of kind of a causal connection, she files a claim, claim gets settled, and a few months later she's terminated. Could you address the retaliation issue? Absolutely, Your Honor. And in fairness to the court and candor, it was actually a couple of weeks, a matter of weeks between the actual payment and conclusion of her workers' comp claim and her termination. Thank you. Your Honor, this is a Title VII retaliation claim. And in order for the plaintiff to make a case for Title VII retaliation, she has to show that she spoke out against or filed some action or participated in some proceeding which was addressing something prohibited by Title VII. So that would be based on her, in her case, her gender. The workers' comp claim doesn't satisfy that. And furthermore, the workers' comp claim was filed back in 2008. So to say that, and after she filed that claim, she took a year off of work, and then she came back and they gave her another job making the same amount of money and allowed her to play her guitar and do her knitting for five years and cause problems for everyone in the agency, basically. They let her hang around. And it was not because of an EAB judge's order. That order is actually found in the record at 208 and 209. And the EAB proceeding was not about her losing her job. It was about three written reprimands being placed in her file. Now, in Canada, the court, I don't know what the, in Mississippi, there are Group 1, Group 2, and Group 3 offenses. And you have to have two Group 2s in a year or one Group 3 in order to be terminated. I believe these were all Group 1 offenses, but I can't attest to that. But this was not about her being terminated. And there was no, her job was not on the line during that proceeding. But when you've paid out the money, that's when the workers' comp claim is going to be back on people's mind and then there's this close connection in time. But I get your point that it's not a Title VII problem. Does Mississippi workers' comp law provide for a retaliation claim? I know it wasn't brought here. That's correct. Your Honor, I'm frankly not certain about that. That was not raised in this case, for sure. And it was not an issue before Judge Girola. At the AB proceeding, and I'm sorry for this sidebar here, but at the AB proceeding, the judge was just addressing these three reprimands. And he heard evidence and he said, you know, it seems like a King Solomon sort of decision. He said, she's been insubordinate, but she's been with the agency a long time. She's a good worker. Let's just go with one reprimand. He doesn't say in his order, give her a job, give this lady a job. That's nowhere in the record other than Ms. Coleman's recollection of what happened. So that's not what occurred here. But going back to the issue of retaliation, this was, this workers' comp proceeding had occurred in 2008 with a prior administration. I think she was ultimately paid around $3,000 on the workers' comp claim. So to say that they turned around and decided to fire her because of that seems a little ridiculous. It also ignores the fact, and Ms. Coleman acknowledges this, that a couple of days before her termination there was yet another personality issue that arose where there was a little award ceremony at the DMR and someone had borrowed a cart that she used in her office, one of these four-wheel carts, to truck things around the office. Somebody had borrowed it to move party favors and drinks and things. And she hit the roof and she cursed some people out, including Ms. Dini. And it was that sort of disruptive behavior that led to Joe Jewell telling Jamie Miller, the executive director, we can do this more efficiently without Ms. Coleman. And that's what they decided to do. So the retaliation claim fails first because there is no Title VII retaliation here, and second because the department had a legitimate nondiscriminatory reason for her termination aside from the workers' comp claim that had been pending for six years. But that reason wasn't the cart incident, was it? That's not the reason that the agency offered at the time, is it? Well, the agency didn't offer a reason when she was terminated because it was under no obligation to do so. Joe Jewell was asked about this in his deposition, and he talked about she was a nice lady, she did some good work, but we had a lot of problems in the office. And some of those things, I don't think they need to be brought up, but there was some inappropriate conduct in the office. And he talked about this issue with the cart. And he said, after all that, I was asked before the October 10th or whatever the deadline was under the 2759, do we need to do any housekeeping? And he told Jamie Miller, the executive director, we can run the trip ticket office more efficiently without Ms. Coleman. So it was never said, we're firing you because of this incident, because they don't have to do that. But those things, I believe, have to be considered. And I guess maybe I misunderstood. I thought it was simply we're doing it because we're reorganizing and we can do this more efficiently with one less person. The termination letter says we are allowed to do this without due, it's a form letter, they sent that out to all 16 people, it wasn't directed just at her. But there wasn't a reason offered at the time. But the context, I believe, is important as to what was going on with her and why they might have said, well, we've carried this on long enough, it's time to move on. The other two claims, and I don't believe that these were addressed by Ms. Persons, so I'll just point them out, but the emotional distress claim, not an appropriate claim under Mississippi law. The Mississippi Supreme Court has stated that generally employment claims are not appropriate for intentional infliction of emotional distress claims. But in any event, Judge Girola determined that the actions of the department were not outrageous and malicious and unreasonable, such as to constitute a claim for intentional infliction of emotional distress. And then here again, Issue 4 was not addressed, but the duty of good faith and fair dealing. Clearly, it is not within the province of the district court, and I don't believe this court to, as Judge Girola said, nudge Mississippi toward the minority view on this issue of whether or not a claim for duty of good faith and fair dealing can exist in the employment context. Mississippi has not followed that. They have recognized that that is a minority position, but they have not adopted that themselves, and there's no reason for this court to suggest that they do at this time. If there are no other questions, Your Honor, I'll yield the remainder of my time. All right. Thank you, counsel. Rebuttal. Rebuttal. I may have spent too much time talking about biscuits. I certainly did not mean to waive any of these claims that to me are all I was going to spend a little time talking about gravy since you brought up biscuits. In any event, I think counsel's, and in fairness to Benny May, he was not involved in this case really until late in the process of the district court action. To his last point about intentional infliction of emotional distress, what particular evidence can you point to in the record which would support such a claim? Judge, again, my view is that this pattern, and we again have to go back to 2007 and go forward with a series. Give me one specific incident that would. Well, excuse me. No, go ahead. I'm sorry. Obviously the fact that a 25-year veteran of certified public manager, expert seasoned fisheries specialist is hit the street without any civil service protections that she's had for 25 years, and basically without even the courtesy of letting her pack her own things. So to be clear, your evidence of intentional infliction of emotional distress is her firearm. And her use, and the agency's use of what may well be a legitimate legislative intent to what Mr. May described as clean this place up, has no rational relationship to my client's termination. So you are telling this court that your client's claim for intentional infliction of emotional distress is based upon the agency's use of a valid Mississippi law allowing for her termination? Without civil service protections, which they well knew she would use and had successfully used to fend off a termination effort back in the initial 2007 and 2008 period. Mr. May correctly points out there were three reprimands. They tried to tell this judge, we can fire her now because we have three reprimands. If you read his order, which he quoted the site, I didn't write it down, but I can give it to you if you give me a second, says there weren't, this is one action, there weren't any three violations. They were trying to fire her then, and they weren't successful because of civil service protections. So, whoa, here comes the legislature trying to let them clean things up, and who do they target? A person whose actions really were one of the first ones to counter this criminal manager. Well, you, again, and this is where I've taken issue with you, you said that she was targeted, but she was part of a group of, I believe it was, is it 15 or 16 people? And as you told me earlier, if she was targeted, she wasn't the first one they went after. You've told me she was the last. She was the last because that's when this workers' comp settlement, it wasn't the payment of the money, it was the settlement that Joe Jewell came to the hearing. I was present myself. Joe Jewell, the same manager that two weeks later, as Mr. May correctly points out, says, hit the street. If you take this evidence and this. I'm confused. Was she terminated because she was targeted, because they were trying to get her out all along, or was she terminated because of this workers' comp settlement? Both, Your Honor. It's a pattern. And this court has said, in these kinds of cases, you have to look at all the evidence. You can make little issues and say, well, she was replaced by somebody older, a female older. Well, you have to go further than that and look at the qualifications. The person has no academic training. She couldn't be doing the job that Ms. Coleman did. She could do collecting the trip ticket part of it, and the record shows that. But Joe Jewell goes into great detail in his deposition, saying, you know, this is one of the most important management things we have to determine how many red snapper you can catch. It's very important. The scientists have to make the analysis. Ms. Deany is a contract, part-time worker. She's not a scientist. But that just shows it's a bad decision from the interest of the agency. It doesn't show that it's motivated by sex if they replaced her with a woman. I mean, that's why you have to show that she was replaced by someone of a different sex to show that it's based on gender discrimination. Your Honor, if I may, in the deposition of Mr. Jewell, he goes into great detail about three or four or five male scientists who are doing that work, not Ms. Deany, male scientists. So you're saying effectively she was replaced by a male. Correct. Okay, even though they did hire the woman for the official position. To go get the tickets. Well, that doesn't take a scientist. Your Honor, just in sum, I would just say that if you look at the total record, Senate Bill 2579 was supposed to be used by DMR to clean this place up. Ava Coleman's termination bears no relationship to that purpose. Thank you, counsel.